FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

99 JUL 29 PM 3: 05

U.S. DISTRICT COURT
N.D. OF ALABAMA

KENNETH M TUCKER, )
)
Plaintiff, )
)
vs. )      CV 97-BU-2814-S
)
CULLMAN REGIONAL MEDICAL )      **ENTERED**
CENTER, )
)      JUL 29 1999
Defendant. )

## Memorandum Opinion

This cause comes on to be heard on (1) a motion for summary judgment filed by Cullman Regional Medical Center ("Cullman Regional") on March 1, 1999, against all claims of Kenneth M. Tucker ("Tucker") and (2) a motion for partial summary judgment filed by Tucker on March 5, 1999, against Cullman Regional on the issue of liability for all of his claims. In its motion, Cullman Regional contends that no genuine issue of triable fact exists supporting Tucker's claims that it discriminated against him on the basis of disability in contravention of section 102(a) of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(a), and section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794. Tucker, in his motion for partial summary judgment, contends that, to the contrary, Cullman

Regional cannot demonstrate a genuine issue of triable fact supporting its claim that it did not discriminate on the basis of disability in violation of the ADA and the Rehabilitation Act.

Summary judgment provides the parties an invaluable opportunity to test the mettle of a case before it ever reaches trial. In evaluating a motion for summary judgment, the court assesses all of the proof the parties can bring to bear to ascertain the presence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Under Federal Rule of Civil Procedure 56, the court's determination of the propriety of summary judgment is to be tempered by a strong inclination in favor of the non-movant. Therefore, only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law is a grant of summary judgment appropriate. FED. R. CIV. P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

It is the initial responsibility of the movant to inform this court of the grounds for its motion and to specifically identify those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The movant carries no meager burden, for it must illuminate for the district court, with reference to materials on file, the reasons why the non-movant cannot or does not raise a genuine issue of material fact sufficient to support a trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). *But see Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998) ("When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' [*Celotex*] at 323 [], in order to discharge this initial responsibility. Instead, the moving party simply may '"show[ ]" — that is, point[ ] out to the district court — that there is an absence of evidence to support the nonmoving party's case.'").

Only after the moving party has satisfied this initial burden must the nonmoving party

"make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). At that point, Federal Rule of Civil Procedure 56(e) dictates that the nonmoving party "go beyond the pleadings" and by "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts'" showing there exist genuine issues for trial. *Celotex*, 477 U.S. at 324; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). "If the non-moving party fails to 'make a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' then the court must enter summary judgment for the moving party." *Gonzalez v. Lee County Housing Authority*, 161 F.3d at 1294 (11th Cir. 1998). Bare speculation based on loose construal of the evidence will not satisfy the non-movant's burden. *See id.*

While the district court is permitted to consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in deciding whether to grant or deny a summary judgment motion, FED. R. CIV. P. 56(c), the non-movant bears the absolute responsibility of designating the specific facts in the record that support its claims. *See United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1438 (11th Cir. 1991); *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). In other words, Federal Rule of Civil Procedure 56 "does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Id. See also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied*, — U.S. —, 116 S.Ct. 74 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson*, 477 U.S. at 254-55. Nonetheless, the court must abstain from examining

the probity of conflicting evidence and from deciding issues of credibility. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). Still though, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135 F.3d 1422, 1425 (11th Cir. 1998) (*citing Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

Where there are cross motions for summary judgment, the district court must pay careful attention to the substantive evidentiary burdens of the moving parties. For a plaintiff to survive a defendant's motion for summary judgment, she must demonstrate that, to the relevant burden of proof, a reasonable trier of fact *could* find for the plaintiff. A defendant can survive a motion for summary judgment far more easily, as it must only demonstrate that some trier of fact could reasonably find that the plaintiff *could not* meet her burden of proof. The district court must also carefully attend to the evidence, recognizing that the same or similar "neutral" facts can give rise to wildly disparate, but equally reasonable, inferences.

Facts [1]

The Plaintiff, Kenneth Tucker, has spent a considerable portion of his life, beginning in his adolescent years, in the consumption alcohol and drugs, including cocaine, marijuana, and quaaludes. Tucker consummed these chemicals often; and with this sustained use, his body came to be dependent on these chemicals.[2] Recognizing that the chemicals he ingested were causing him to suffer deleterious physical, mental and social consequences and concluding that he suffered from a chemically-induced apraxia that prevented him from halting his consumption without aid, Tucker sought out, on January 7, 1982, assistance in the treatment of his addiction at Brookwood Lodge, an entity affiliated with the Brookwood Hospital in Birmingham, Alabama. From then until February 23, 1982, Tucker received assistance in surmounting the problems occasioned by his ingesting of deleterious substances. Although released with a clean bill of health, the treatment was, largely, a failure, as the Plaintiff soon fell back into his habit of the regular consumption of alcohol and drugs.

The Plaintiff again attempted to shake his substance dependancy when, on May 28, 1986, he enrolled in a supervised in-patient treatment and drug rehabilitation program at the Brookwood Parkside Hospital in Warrior, Alabama. Tucker remained there until July 11,

---

[1] "The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record." *Underwood v. Life Ins. Co. of Georgia*, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998). The factual narrative presented here is developed in the light most favorable to the plaintiff and with all *reasonable* inferences drawn in support of the plaintiff's position. *See Hunt v. Cromartie*, — U.S. —, —, — S.Ct. —, —, 1999 WL 303677 at *6 (May 17, 1999). Whether this narrative would be borne out in the facts developed at trial is another matter. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] Tucker's chemical dependency also caused him no small degree of legal trouble. Prior to 1986, Tucker was convicted four times for driving under the influence of alcohol and arrested on between one to three occasions, inclusive, for public intoxication. One of the arrests for public intoxication also included a charge for the use and possession of marijuana.

1986, when he completed his tenure in the rehabilitation program. Again, the assisted treatment failed; Tucker quickly descended back into the use of drugs and alcohol.

On January 27, 1988, apparently without any assistance and through sheer force of will, Tucker ceased his ingestion of those chemicals on which he had been physically dependent. His strength of will sufficed to keep him resistant to the lure of those substances for nearly six and a half (6 1/2) years.

Having freed himself of his chemical dependency, the Plaintiff made an attempt to "better himself." Tucker applied for, and was admitted to, the nursing school at Wallace State College in 1993, which he attended as a full-time student. While a student, Tucker showed promise: He received satisfactory grades and was well-liked and highly regarded by the faculty at the College. While he attended nursing school, Tucker also worked in several different clinical settings, including St. Vincent's Hospital, Med/Surg Nursing; Brookwood Hospital, Mental Health Center, Psychiatric Nursing; Carraway Methodist Medical Center, Med/Surg Nursing, CCU; Children's Hospital of Alabama, Pediatric Nursing; and Medical Center East, Obstetric Nursing.

In spite of his efforts to resist the lure of alcohol and drugs, in 1994, Tucker's will weakened and, as a consequence, he relapsed into the use of the destructive chemicals. This time, the physical consequences of Tucker's resumption of his habit were harsh. The Plaintiff's life fell into disrepair as he became incapable of concentrating, working or caring for himself. His appetite dissipated; he grew thin and listless. Often, the plaintiff would lose consciousness. Physical illness became a regular occurrence. In November of 1994, Tucker fell into a coma as a consequence of a chemical overdose and was admitted to a hospital.

The Plaintiff entered into a supervised, in-patient rehabilitation program at Bradford-Parkside Hospital in Warrior, Alabama, on November 26, 1994. Since successful completion of the rehabilitation program on December 11, 1994, Tucker has abstained from the

consumption of drugs or alcohol.[3]

Cullman Regional[4] hired Tucker as a nursing assistant on September 5, 1995, after he was interviewed by Deborah Mason ("Mason"), the registered nurse director of the Critical Care unit on the East Wing of Cullman Regional's Fourth Floor. Mason was the Plaintiff's supervisor, while Lori McGrath, the vice president of Patient Care Services, was responsible for the entire nursing staff at Cullman Regional. Apparently, both of these individuals were apprized, at some early point during the course of Tucker's employment with Cullman Regional, that he had previously suffered a period of chemical dependancy, but that he had completed a recovery program in 1994 that had positive results.

The Plaintiff's position as a nursing assistant required him to work in whatever unit at Cullman Regional in which he was needed. Though his duties would often require him to work in other units, Tucker's primary assignments were to the Fourth Floor "med-surg" unit and the critical care unit. The Plaintiff's responsibilities as a nursing assistant at Cullman Regional included assisting patients in feeding, bathing, and ambulation. In addition, the Plaintiff was required to have the capacity to perform CPR and to monitor a patient's pulse, heart rate, body temperature and the like. Further responsibilities included the transport of patients, emptying of bed pans, linen changing, and, residually, providing patients with assistance in all facets of their daily lives. In the case of a medical problem, the Plaintiff, as a nursing assistant, was obligated to summon licensed personnel. Tucker's job duties did not include handling medications.

Tucker's ability to discharge his duties with competence and compassion brought him favorable reviews by staff members at Cullman Regional.

---

[3] After his final in-patient treatment at Bradford-Parkside Hospital, the Plaintiff received further outpatient treatment at the Alcohol and Drug Abuse Council from January 9 to January 21, 1995.

[4] Cullman Regional is a hospital that receives federal funds through Medicare reimbursements.

While working as a Nursing Assistant for the defendant, the plaintiff performed his job duties in a more than satisfactory manner, and received favorable evaluations. Mary Jones, the Director of Emergency Services, testified that she was pleased with the work that the plaintiff performed for her and that he had no performance problems. Lori McGrath, the defendant's Vice President of Patient Care Services and Chief Nursing Officer, recalls receiving written compliments about the plaintiff and that he was "well-liked by his patients." In fact, the plaintiff was so well-liked because of the manner in which he carried out his duties that he was often specially requested to work in certain departments.

Plaintiff's Brief in Support of Cross Motion for Partial Summary Judgment at 7-8.

On December 7, 1995, Tucker completed his coursework at Wallace State College and obtained his Associate in Applied Science Degree in Nursing. As a consequence of obtaining the degree, the Plaintiff became entitled to sit for the RN Nursing examination, the NCLEX-RN, with the Alabama Board of Nursing. Two weeks after receiving his degree, on December 21, 1995, Tucker applied to the Alabama Board of Nursing for licensure as a registered nurse by examination.

In his application to the Alabama Board of Nursing, Tucker recited the facts involving his prior chemical dependency and stated that he had completed, just over a year before his application, a rehabilitation program. The Alabama Board of Nursing responded with concern to the Plaintiff's revelations, which prompted it to hold a hearing to decide whether a license should be issued to the plaintiff upon passage of the RN Nursing Examination and, if so, whether that license should be issued to Tucker with or without restrictions.

Tucker, after learning of the hearing, informed Mason that the Alabama Board of Nursing had informed him that his prior substance addiction could render "it difficult for him to sit with his boards." To assuage the Alabama Board of Nursing's concerns regarding his ability to safely perform the duties of a Registered nurse, Tucker asked Mason to write a letter of recommendation to the Board of Nursing; Mason happily acceded to the request. In addition, Mary Jones ("Jones"), director of the Emergency Services Department, aided in the drafting of the recommendation because "[she and Mason] thought Mr. Tucker was a very

personable Nursing Assistant and [they] wanted to help him" in his pursuit of a career as a registered nurse. In her letter to the Board of Nursing, Mason indicated that she would consider the plaintiff for a registered nurse position with the defendant.

> Ken Tucker is employed at Cullman Regional Medical Center as a Nursing Assistant on a Medical Surgical floor. He has functioned in this capacity since September of 1995. During this time he has performed his duties with caring competence. He has been active in improving patient care and has a strong desire to see the patient care team he is involved in give the best care possible. He has been very reliable in attendance and has been flexible to meet the scheduling needs of the department. I do feel he would contribute a great deal more as an R.N. and I would definitely consider him as a position becomes open.

Prior to drafting this letter, neither Mason nor Jones had written a letter of recommendation to the Board of Nursing on behalf of an applicant.

The Alabama Board of Nursing conducted a hearing on Tucker's application for a licence on April 16, 1996, in which it addressed two difficulties it saw in granting a license to Tucker:

> From on or about January 29, 1981 - March 27, 1989, RESPONDENT was arrested and convicted of multiple alcohol-related offenses; i.e., DUI, public intoxication, disorderly conduct.

> RESPONDENT admits that he has used and abused alcohol, marijuana, cocaine, Quaaludes, and other drugs from an early age until 1994.

On June 20, 1996, the Board of Nursing issued its finding of fact and ruling on Tucker's application for a registered nurse license, in which it first noted that "[Tucker's] conduct constitute[d] grounds for disciplinary action, including denial of licensure, for violation of *Code of Alabama*, (1975), § 34-21-25 and *Alabama Board of Nursing Administrative Code* § 610-X-8-.01(e)(g) and 610-X-8-.05(c)." Satisfied that Tucker was freed of his chemical dependency, however, the Board of Nursing allowed Tucker to take the registered nurse examination. Although its concerns were sufficiently appeased to make it willing to grant Tucker a license on the assumption that he passed the registered nurse examination, the Board of Nursing's

trepidation about Tucker's prior substance addiction caused it to impose a four-year probation on Tucker and to subject his prospective license to multiple restrictions. Among the restrictions, Tucker was required to submit proof of entry into a primary intensive alcohol/drug treatment program, to complete a drug and alcohol aftercare program following completion of the intensive rehabilitation program, to participate on a tri-weekly basis in an Alcoholics Anonymous or Narcotics Anonymous program, to take part in individual or group counseling, to undergo monthly random drug screening, and to abstain from unprescribed drug and alcohol use. In addition, the Board of Nursing imposed upon Tucker several work-related restrictions, among which were the following:

(1) For six months after employment as a registered nurse on probationary status, Tucker was not permitted to administer or have access to controlled substance medications; thereafter he could administer controlled substances only if the Nursing Board lifted the restriction upon the request of Tucker and his employer;

(2) Tucker could only work in a circumstance in which he was under the on-site supervision of a named registered nurse, who could periodically delegate her supervisory duty to other registered nurses;

(3) Tucker could not work as a charge nurse; and

(4) Tucker could not work more than three consecutive 12-hour shifts in seven days nor more than 40 hours in a one-week period or more than 80 hours in a two-week period.[5]

---

[5] The Defendant contends that Tucker failed to comply with the probationary requirement of his licensure that he enroll in a primary intensive drug treatment program within the time period stated in the decision of the Board of Nursing and that "[t]his failure violated Paragraph 26 of the Board's order, which provided that 'Any deviation from the requirements of this probation without the written consent of the Board shall constitute a violation of this probation.'" Cullman Regional's Brief in Support of Its Motion for Summary Judgment at 5-6.

The Plaintiff responds that because he had previously completed a primary intensive alcohol/drug treatment program at Bradford-Parkside Hospital, he was under no obligation to re-enroll in such a program after he received the order of the Board of Nursing. Indeed, as required by the Board of Nursing, the director of the Bradford program submitted, within the time allotted, proof of Tucker's completion of

In the final days of June and the early days of July, 1996, Tucker took the registered nurse examination. Tucker's efforts were not without reward; on July 20, 1996, he received the results of the examination, indicating that he received a passing score. Having passed the examination, the Plaintiff informed his supervisors, including Jones, Mason, and McGrath, of his licensure as a registered nurse and of the restrictions placed upon his license by the Alabama Board of Nursing.[6]

Prior to Tucker's passing his registered nurse examination, McGrath sent a memorandum to Glenn Sisk, Cullman Regional's human resources director, pertaining to the restrictions imposed on any prospective license given Tucker. McGrath voiced a concern that Cullman Regional "had a situation where there are concerns that an individual cannot perform the essential functions of a job." Deposition of Lori McGrath, Exhibit 2. However, McGrath indicated, no action was then required, as the Plaintiff had yet to pass the license examination or apply for a position as an registered nurse with Cullman Regional.

In late December 1995, or early January 1996, Mason informed Tucker that Jones wished to hire him as an registered nurse in the emergency room after he obtained his registered nurse license and that she would consider him for any position for which he was

---

its primary intensive treatment program. Nor, states the Plaintiff, did his compliance with the requirement by reference to his prior completion of a treatment program cause the Board of Nursing to find him out of compliance with its order, as he received routine letters from the Board of Nursing stating that he was in full conformity with the terms of the order.

   Moreover, Tucker asserts, he met the requirement that he enroll in and finish a chemical dependency aftercare program. As part of the treatment Tucker received at Bradford, the plaintiff was enrolled in an aftercare program at the time of the entry of the order and thereafter. Indeed, Bradford submitted in writing on a Board-approved form evidence of Tucker's adequate participation and progress in the aftercare program.

   [6] It appears that his supervisors, or, at least, McGrath, was informed of the restrictions that would be placed upon his license if he passed the registered nurse examination in the early part of July 1996.

qualified that became available.[7]  Tucker, soon after learning of Jones's intention, preemptively applied for registered nurse positions in the emergency room.  According to the Plaintiff, after he received his license from the Board of Nursing in July of 1996, Jones contacted him and informed him that she wanted to hire him as a registered nurse in the emergency room, even with the restrictions placed on his license in the order of the Board of Nursing.

At some unspecified point in time, the Plaintiff also applied for a registered nurse position in the Oncology Center.[8]  Finally, in September 1996, Tucker applied for a registered nurse position with the med-surg unit on the Third Floor of Cullman Regional.  After Tucker received his license and applied for registered nurse positions with Cullman Regional, McGrath and Sisk discussed whether, with the restrictions placed upon Tucker by the Board of Nursing, Cullman Regional could employ him in the position of a registered nurse.  Aware of the Plaintiff's restrictions, Sisk discussed with Ms. McGrath whether they could arrive at any "reasonable accommodations" for Tucker such that he could be hired into an registered nurse position.  Allegedly, either in her discussions with Sisk or in her recommendation to Sisk, McGrath concluded, based on Tucker's inability to administer medications and his inability to supervise others that would be working under him, that Tucker would be incapable of performing the essential functions of any registered nurse position.  In addition, Cullman Regional asserts, concerns existed that Tucker might be called upon to work as a charge nurse or, if employed in the emergency room, to work more than forty hours in a week.  Thus, despite representations by Mason that Cullman Regional had not "come all this way with you just to drop you now" and by McGrath that he deserved a second chance on August 2, 1996, McGrath informed Tucker that he would not receive a promotion into any registered nurse

---

[7] According to the Plaintiff, Cullman Regional fills its registered nurse staffing needs by drawing from its pool of Nursing Assistants.

[8] The Plaintiff apparently makes no claims regarding this position with the Defendant.

position. In effect, states the Plaintiff, he was told that he could not be employed as a registered nurse with the Defendant because he "was in recovery from drugs and alcohol."[9]

On the day Tucker was told that no registered nurse position would be offered him, Sisk instructed Mason to remove Tucker from the nursing assistant work schedule. After learning of his involuntary leave of absence, Tucker inquired of Sisk why he had been excised from the work schedule. While aware that Tucker desired to keep his job as a nursing assistant until he could be promoted into a registered nurse position, Sisk refused to let him stay, allegedly telling Tucker, "you have worked yourself out of a job." Plaintiff's Deposition at 138.

Cullman Regional officially terminated Tucker's employment on August 26, 1996, giving as a reason Tucker's graduation from a registered nurse program. According to the Defendant, it has an unwritten policy precluding an individual who has received a registered nurse's license from working in a lesser nursing assistant position. The Defendant states that the purpose behind the policy is to have a clearly demarcated hierarchy among the nursing staff, preventing the possibility for confusion in the administration of medical treatment.

While not conceding that such is a policy of Cullman Regional, Tucker does affirm the existence of the practice of not permitting registered nurses to work as nursing assistants. However, Tucker asserts that the alleged policy was put into use sporadically, at best. In support of his position, Tucker draws attention to testimony of Sisk, in which Sisk was unable to produce the name of another nursing assistant who was terminated after receiving a nursing license.

According to the Plaintiff, Cullman Regional refused to offer him a reasonable accommodation by making an exception to its policy not to retain licensed nurses in nursing assistant positions. Indeed, states the Plaintiff, Sisk testified that it would have been no hardship

---

[9] The Plaintiff alleges that although Cullman Regional should have attempted to contact the Board of Nursing and obtain a waiver in order to work in spite of some of the temporary restrictions, no one from Cullman Regional made such an attempt on his behalf as a "reasonable accommodation."

to Cullman Regional to allow Tucker to keep his nursing assistant position.

In June of 1998, Tucker surrendered his nursing license because of an inability to afford maintaining his license — which required him to pay at least $65.00 per month to undergo drug screenings — while making limited income as a per-diem registered nurse at Huntsville Hospital and later at Bradford Health Services.

## Contentions & Analysis

Both the ADA and the Rehabilitation Act provide protection against discrimination in employment on the basis of disability and, as regards employment discrimination, the provisions of the two statutes are largely coextensive, as Congress has mandated that employment discrimination claims brought pursuant to section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), be adjudged by the same standards that govern employment discrimination claims under Title I of the ADA. 29 U.S.C. § 794(d). To prove a case of employment discrimination, a plaintiff bringing an action under either the ADA or the Rehabilitation Act must demonstrate (1) that he or she has a disability; (2) that he or she is a "qualified" individual; (3) that he or she suffered an adverse job action; and (4) that the adverse job action was related to the plaintiff's disability. *See Gordon v. E. L. Hamm & Associates, Inc.*, 100 F.3d 907, 910 (11th Cir. 1996), *cert. denied,* — U.S. —, 118 S.Ct. 630 (1997). While the plaintiff in a disability case must prove these first three elements as a threshold matter, the fourth element can be proven either through direct evidence or the circumstantial evidence test developed in *McDonnell Douglas v. Green. See Bogle v. Orange County Bd. of County Comm'rs*, 162 F.3d 653, 656 (11th Cir. 1998).

Section 12102(2) of Title 42, the ADA, defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

A coordinate provision of the Rehabilitation Act, 29 U.S.C. § 705(20)(B), defines the term "individual with a disability," for purposes of those subchapters dealing with employment discrimination, as:

[A]ny person who--
(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities;
(ii) has a record of such an impairment; or
(iii) is regarded as having such an impairment.

Essentially, therefore, the relevant definitions of covered individuals under the two statutes are the same. A plaintiff seeking to demonstrate that he is disabled must show either that he (1) presently has a disability; (2) has a record of having a disability; or (3) is regarded as having a disability. This inquiry is not made speculatively with regard to the type of impairment suffered; rather, "whether a person has a disability under the ADA is an individualized inquiry." *Sutton v. United Airlines, Inc.*, — U.S. —, —, to be reported at 119 S.Ct. 2139, 1999 WL 407488 at *8 (June 22, 1999). *See Albertsons, Inc. v. Kirkingburg*, — U.S. —, —, *to be reported at* 119 S.Ct. 2162, 1999 WL 407456 at *6 (June 22, 1999) ("The Act expresses that mandate clearly by defining 'disability' 'with respect to an individual,' 42 U.S.C.§ 12102(2), and in terms of the impact of an impairment on 'such individual,' § 12102(2)(A).").

In the instant case, Tucker asserts that he has a "disability" within the meaning of the ADA, 42 U.S.C. § 12102(2), and he is an "individual with a disabiltity" within the compass of the Rehabilitation Act, 29 U.S.C. § 705(20) because he meets each of the three listed definitions —, i.e., he actually has a physical or mental impairment that substantially limits a major life activity, he has a record of such impairment and/or is regarded by his employer as having such an impairment. Cullman Regional responds that Tucker meets none of these definitions.

In support of his claim that he presently suffers from a physical or mental impairment

that substantially limits a major life activity, the plaintiff claims that he is a "recovering substance abuser." Noting that while both the ADA and the Rehabilitation Act exempt from their coverage (in the employment context) those employees currently engaged in the illegal use of drugs, Tucker states that the exclusion stops there, saying nothing about those who are no longer using illegal drugs. The implication, the Plaintiff asserts, is that Congress meant to provide protection for those individuals who are in recovery from the use of drugs. The Defendant responds that although the statutes only exempt the current use of drugs from the class of qualified individuals with disabilities under the ADA or from the class of individuals with a disability under the Rehabilitation Act, the Plaintiff nonetheless is not presently disabled because his alleged addiction does not presently substantially limit a major life activity.

Sections 705(20)(C)(i) & (ii) of Title 29, the Rehabilitation Act, circumscribe the definition of an "individual with a disability" to exclude those individuals who are engaged in drug use:

(i) In general; exclusion of individuals engaging in drug use
For purposes of subchapter V of this chapter [§29 U.S.C.A. 790 et seq.], the term "individual with a disability" does not include an individual who is currently engaging in the illegal use of drugs, when a covered entity acts on the basis of such use.
(ii) Exception for individuals no longer engaging in drug use
Nothing in clause (i) shall be construed to exclude as an individual with a disability an individual who —
(I) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;
(II) is participating in a supervised rehabilitation program and is no longer engaging in such use; or
(III) is erroneously regarded as engaging in such use, but is not engaging in such use;
except that it shall not be a violation of this chapter [29 U.S.C.A.§ 701 et seq.] for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual described in subclause (I) or (II) is no longer engaging in the illegal use of drugs.

The ADA contains a similar exclusion; however, the exclusion is not contained within the

portions of the statute defining "disability." Rather the exception is from the meaning of the term "qualified individual with a disability" contained in Title I.[10] This exclusion, housed in §§ 12114(a) & (b) of Title 42,entitled "Illegal use of drugs and alcohol," states:

> (a) Qualified individual with a disability
>
> For purposes of this subchapter, the term "qualified individual with a disability" shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use.
> (b) Rules of construction
> Nothing in subsection (a) of this section shall be construed to exclude as a qualified individual with a disability an individual who —
>
> > (1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;
> > (2) is participating in a supervised rehabilitation program and is no longer engaging in such use; or
> > (3) is erroneously regarded as engaging in such use, but is not engaging in such use;
>
> except that it shall not be a violation of this chapter for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual described in paragraph (1) or (2) is no longer engaging in the illegal use of drugs.

There are no Eleventh Circuit Court of Appeals cases describing the impact of these statutory sections on a plaintiff's claims of disability discrimination under either the ADA or the Rehabilitation Act. Both the ADA and the Rehabilitation Act carve, for purposes of employment discrimination, current users of illegal drugs out of the scope of disabled individuals. In turn, both the ADA and the Rehabilitation Act, "[w]hile expressly excluding current drug users from statutory protection, . . . provide a "safe harbor" for recovering addicts. . . ." *Shafer v. Preston Memorial Hospital Corporation*, 107 F.3d 274, 276 (4th Cir. 1997).

---

[10] The definition of "disability" under the ADA falls outside of Title I and thus is excluded from the flow-through provisions of section 504(d) of the Rehabilitation Act, 29 U.S.C. § 794(d). As such, the Rehabilitation Act definition of "disability" and "individual with a disability" apply to employment discrimination cases brought under the Rehabilitation Act. The exclusion for individuals currently engaging in the use of drugs appears within the Rehabilitation Act definition of individual with a disability, however, thereby rendering the ADA provision redundant in cases brought under the Rehabilitation Act.

Thus, in determining whether a past or present user of illegal drugs is protected under the ADA or the Rehabilitation Act, a district court should first determine whether a substance abuser falls within the statutorily prescribed definition of disability.[11]  If so, the court should then turn to the issue of whether the individual is a "current" drug user.  *See Salley v. Circuit City Stores, Inc.*, 160 F.3d 977, 980 n.2 (3rd Cir. 1998).  Even if a "current" drug user under the statute, if the individual falls within the "safe harbor" exceptions, he will nonetheless be entitled to the statute's protection.[12]

It appears to be the case that the Plaintiff's alcoholism and prior addiction to illegal drugs do constitute an impairment under the statute.  Nonetheless, the Plaintiff, presenting as his impairment a chronic addiction to drugs or alcohol from which he is "in remission," must still demonstrate that such impairment presently constitutes a substantial limitation to a major life activity.  As the Supreme Court stated in *Sutton*:

> A "disability" exists only where an impairment "substantially limits" a major life activity, not where it "might," "could," or "would" be substantially limiting if mitigating measures were not taken. A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently "substantially limits" a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not "substantially limi[t]" a major life activity.

*Sutton v. United Airlines, Inc.*, — U.S. at —, 119 S.Ct. at —, 1999 WL 407488 at *8.  The Plaintiff has not demonstrated that, at present, his impairment limits him in any capacity — he can breathe, eat, ambulate and ruminate as well as any other person.  That speculatively he

---

[11] Were individuals recovering from substance abuse covered by the ADA or Rehabilitation Act without regard to their individual crcumstances, this would contravene the requirement that the existence of disability be made on a case-to-case basis.

[12] While this framework seems to work well for the safe harbor exclusions of recovering drug users, the three part test seems inapposite for those regarded as having engaged in drug use, as such individuals would fail to fit the profile of "current" users in any case.

*might* fall back into his bad habits or *could* relapse into drug and alcohol use, does not render him presently substantially limited in any major life activity.

Next, Tucker contends that he has a record of a disability. Again, there is no doubt that his past abuse of drugs and alcohol constituted an impairment under the statute. The relevant issue, then, is whether such use in the past substantially limited a major life activity. The Plaintiff asserts in his brief the following reasons for concluding that his past drug and alcohol use substantially impaired a major life activity:

> In the instant case, the plaintiff has presented undisputed evidence that his addiction to drugs and alcohol have substantially limited major life activities. The plaintiff's drug and alcohol addiction caused him to be unable to concentrate, work, care for himself. (Pl. Exh. 6 at 16). While using alcohol and drugs, the plaintiff experienced significant weight loss, would routinely experience blackouts, and would became physically ill as a result of his drug and alcohol use. (Pl. Exh. 6 at 16). In addition, as a result of his addiction, the plaintiff was arrested on numerous occasions for alcohol and drug related incidents, including driving under the influence, possession of a controlled substance, and public intoxication. (Pl. Exh. 6 at 17). In fact, the plaintiff's addiction so affected his life activities that it led to him being admitted into the hospital in 1994 in a coma because of a drug overdose.

Plaintiff's Brief in Support of Cross Motion for Summary Judgment at 24. Given certain language in *Sutton*, this Court is of the opinion that "working" is not to be treated as a "major life activity" for purposes of the ADA or the Rehabilitation Act. *Id*. at * 14 ("We note . . . that there may be some conceptual difficulty in defining "major life activities" to include work, for it seems "to argue in a circle to say that if one is excluded, for instance, by reason of [an impairment, from working with others] . . . then that exclusion constitutes an impairment, when the question you're asking is, whether the exclusion itself is by reason of handicap."). Therefore, to have a record of an impairment substantially limiting a major life activity, Tucker must demonstrate (1) that "concentration" and "self-care" are major life activities and (2) that his past drug and alcohol use substantially limited his ability to concentrate and his ability to care for himself.

Although the cases of the Eleventh Circuit Court of Appeals rely heavily on EEOC regulations in coming to the conclusion that self-care (or concentration) is a major life activity, *see, for example, Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1327 n.1 (11th Cir. 1998), *reh'g en banc denied*, 172 F.3d 884 (1999), and the Supreme Court has apparently forsworn reliance on the EEOC regulations in determining the definition of "disability" under the ADA, *see Sutton v. United Airlines, Inc.*, — U.S. at —, 119 S.Ct. at —, 1999 WL 407488 at *6, this Court has no difficulty in concluding that both self-care and concentration are to be considered substantial life activities. Both are essential components of the normal human life of mature individuals. However, this Court is not of the opinion that the prior drug and alcohol use substantially limited the Plaintiff's ability to engage in these major life activities.

In *Sutton*, the Supreme Court discussed the restrictive character of the term "substantially limits":

> The ADA does not define "substantially limits," but "substantially" suggests "considerable" or "specified to a large degree." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (1976) (defining "substantially" as "in a substantial manner" and "substantial" as "considerable in amount, value, or worth" and "being that specified to a large degree or in the main"); *see also* 17 OXFORD ENGLISH DICTIONARY 66-67 (2d ed.1989) ("substantial": "[r]elating to or proceeding from the essence of a thing; essential"; "of ample or considerable amount, quantity or dimensions"). The EEOC has codified regulations interpreting the term "substantially limits" in this manner, defining the term to mean "[u]nable to perform" or "[s]ignificantly restricted." *See* 29 CFR § 1630.2(j)(1)(i), (ii) (1998).

*Id.* at *13. "In determining whether an impairment substantially limits a major life activity, the court must consider evidence of the nature and severity of the impairment, its duration, and whether it will have a permanent or long-term impact." *Haiman v. Village of Fox Lake*, — F.Supp.2d —, —, 1999 WL 476973 at *6 (N.D.Ill. July 7, 1999). The intermittent blackouts occasioned by actual drug use, the loss of appetite and the single coma could have no sustained impact on either the Plaintiff's ability to care for himself or to concentrate. Despite his loss of appetite, there is no indication that the Plaintiff significantly neglected his nutritional

requirements. Further, the Plaintiff's blackouts are not alleged to be so regular and consistent that he was unable to concentrate without such blackout interfering on a regular basis. Rather, his blackouts were apparently tied to his periods of drug and alcohol use; they were brief intercessions into his concentration that were the result of an intention to intercede by consuming the chemicals. Finally, his coma was a sporadic, one-time event that had no apparent long-term repercussions. *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194,1197 (7ᵗʰ Cir. 1997) (the temporarily disabled are not protected under the ADA). There is no indication that, and no reasonable trier of fact could find that, the Plaintiff, as a consequence of his drug use was, except for in short, sporadic periods, unable to concentrate or take care of himself or was to a considerable degree — that is, significantly — restricted in his concentration or ability to care for himself.

Finally, the Plaintiff alleges that he was regarded as having a disability by Cullman Regional. Tucker bases this argument on the grounds that all individuals at Cullman Regional who enjoyed supervisory authority over him knew of his history of substance addiction.[13]

> Under subsection (C) [of 42 U.S.C. § 12102], individuals who are "regarded as" having a disability are disabled within the meaning of the ADA. *See* § 12102(2)(C). Subsection (C) provides that having a disability includes "being regarded as having," § 12102(2)(C), "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," § 12102(2)(A). There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual — it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often "resul[t] from stereotypic

---

[13] Tucker also fabricates from his deposition testimony a statement by McGrath that he was not being promoted and that he was being terminated because of his past substance addiction. However, the Plaintiff's testimony does not, by any stretch of the imagination, support this assertion. Even if it did, the Court's conclusion that Tucker was not regarded as disabled would remain unchanged.

assumptions not truly indicative of . . . individual ability." *See* §42 U.S.C. 12101(7). *See also School Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 284 [] (1987) ("By amending the definition of 'handicapped individual' to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life activity, Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment"); 29 CFR pt. 1630, App. § 1630.2(l) (explaining that the purpose of the regarded as prong is to cover individuals "rejected from a job because of the 'myths, fears and stereotypes' associated with disabilities").

*Sutton v. United Airlines, Inc.*, — U.S. at —, 119 S.Ct. at —, 1999 WL 407488 at * 6. Similarly, the Rehabilitation Act defines as "individual with a disability" a person who is misperceived as having an impairment that imposes a substantial limitation on a major life activity.

To demonstrate that he was regarded as disabled, a plaintiff must do more than merely show that his employer knew of his impairment. Were such proof sufficient, an employee wearing glasses, who broadcasts his sight impairment (however slight), could overcome the hurdle of demonstrating that he was regarded as disabled by proving that his employer saw him wearing his glasses. The mere fact that McGrath or Sisk knew of the Plaintiff's prior substance addiction is insufficient to support the conclusion that either supervisor misperceived the impairment to be substantially limiting. The Plaintiff must provide, in addition to evidence supporting the inference that the supervisor knew of his impairment, some evidence that demonstrates that the employer was under the misconception that the impairment was substantially limiting to a major life activity. This the Plaintiff has failed to do. Therefore, having failed to raise a genuine issue of triable fact that he is either "disabled" within the compass of the ADA or an "individual with a disability" under the Rehabilitation Act, the Plaintiff' cannot survive the Defendant's motion for summary judgment on all of his claims.

Conclusion

For the forgoing reasons, the Defendant's motion for summary judgment will be GRANTED. The Plaintiff's cross-motion for summary judgment will be DENIED. This case will be DISMISSED, with prejudice. While it is unfortunate that the Plaintiff in this case was ill-used by the Defendant, the law provides no protection against the mere poor treatment of employees. Rather, society relies upon simple humanity to guarantee that individuals are treated fairly by their employers.

DONE and ORDERED this 29th day of July 1999.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE